BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599

Attorneys for Plaintiffs and the [Proposed] Class

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| WILLIAM SCHOENKE, HEROCA HOLDING B.V., AND NINELLA BEHEER B.V., On Behalf of Themselves and All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>CHINA AGRITECH, INC.; YU CHANG; YAU-SING TANG; GENE MICHAEL BENNETT; XIAO RONG TENG; MING FANG ZHU; LUN ZHANG DAI; HAI LIN ZHANG; CHARLES LAW; ZHENG ANNE WANG; and DOES 1 to 10, Inclusive,<br><br>                    Defendants. | Case No. CV 14-05083-RGK (PJWx)<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS [§§ 10(b) and 20(a) of the Securities Exchange Act of 1934 & SEC Rule 10b-5 (17 C.F.R. § 240.10b-5)]**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

William Schoenke, Heroca Holding B.V. and Ninella Beheer B.V. ("Plaintiffs") individually and on behalf of all other persons similarly situated, by and through their undersigned attorneys, allege in this Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an independent investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by China Agritech, Inc. ("CAGC" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet; (e) interviews by investigators of several witnesses with personal knowledge of certain relevant facts; (f) investigation of Chinese State Administration of Industry and Commerce ("SAIC") filings;[1] (g) investigation of Chinese State Administration of Taxation ("SAT") filings;[2] and (h) review of the orders entered in pleadings and prior actions formerly and presently pending against the Company, as detailed below; and (i) investigation and analysis of companies alleged to be suppliers of the Company.

## NATURE OF THE ACTION

1.     This is a class action on behalf of a class consisting of all persons and entities, other than defendants and their affiliates, who purchased the publicly traded common stock of CAGC between November 12, 2009 through March 11, 2011 (the

---

[1]     The SAIC (State Administration for Industry and Commerce) is the Chinese government body that regulates industry and commerce in China.  It is primarily responsible for business registrations, issuing and renewing business licenses and acts as the government supervisor of corporations. All Chinese companies are required to file financial statements with the Chinese government annually or bi-annually.

[2]     The SAT (State Administration of Taxation) is the People's Republic of China ("PRC") equivalent of the Internal Revenue Service in the U.S.

"Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws (the "Class").[3]

2.     This Complaint alleges claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all Class members.

3.     CAGC is a holding company. Its purported business operations are primarily conducted through its direct and indirect subsidiaries in the PRC.   It purports to manufacture and sell organic compound fertilizers and related agricultural products.

4.     During the Class Period, CAGC and its officers and directors engaged in a systemic and wide-ranging scheme that fraudulently created nearly all of CAGC's reported revenue and earnings:

- Overstating revenue by at least 1,100% for fiscal 2009 and 1,500% for fiscal 2008.

- Reporting $76.13 million of revenue in 2009 and $45.24 million in 2008 on CAGC's Form 10-Ks filed with the SEC, when the true revenue figures according to CAGC's SAIC and SAT filings in PRC were not more than $6.99 million in 2009 and $2.95 million in 2008.

- Overstating net income by at least 600% for fiscal 2009.  Reporting a profit for fiscal 2008, while the Company was in fact losing money.

- Reporting $6.17 million of net income in 2009 and $8.6 million in 2008, when the true net income figures were not more than $0.97 million in 2009 and a net loss of ($1.89) million in 2008.

- Failing to disclose material related party transactions - CAGC signed a contract effective December 8, 2008 to pay Shenzhen Hongchou

---

[3]     For the Court's convenience, attached hereto as Exhibit A is a redlined copy of this complaint showing changes from the Amended Complaint filed on September 4, 2014 (Dkt. 24).

Technology Co. ("Shenzhen Hongchou"), a company controlled by CAGC's Chief Executive Officer ("CEO") Yu Chang ("Chang") approximately $4.0 million for raw materials.

- CAGC has maintained two materially different sets of financial reports, accounts, and/or records. The first set of records was filed with the SEC for the benefit of investors. Said records were replete with material falsities misrepresenting the Company's business operations. The other set of records, provided to Chinese authorities, reflected results for the Company that were only a tiny fraction of the false figures reported to the SEC that investors relied upon.

5. During the Class Period when CAGC was issuing false and misleading financial statements, Defendants Teng, Tang and Zhu sold over $3.0 million of CAGC stock and CAGC sold approximately $23 million in a public offering to unwitting investors.

6. Then, on March 14, 2011, CAGC's auditor Ernst & Young Hua Ming ("E&Y") stated that it "may not be able to rely on management's representations."

7. That same day, CAGC terminated E&Y's role as auditor and NASDAQ delisted and halted trading in CAGC's stock "in order to protect the public interest."

8. In the wake of the scandal, nearly all of the Company's directors and officers resigned.

9. CAGC has not filed its annual report for 2010 on Form 10-K with the SEC, which was originally due on March 16, 2011. Consequently, on October 17, 2012 the SEC issued an enforcement order revoking the registration of CAGC's stock. Thus, CAGC's stock is no longer publicly traded, effectively rendering it worthless. The last trade of CAGC shares prior to the revocation order was at $0.16/share. To date, CAGC still has not filed any reports with the SAC.

10.     CAGC's false statements have caused investors substantial losses as its shares have dropped from $10.78/share to nearly zero as a result of defendants' violations of the securities laws.

## JURISDICTION AND VENUE

11.     The Exchange Act claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), 28 U.S.C. § 1391(b), 28 U.S.C. § 1391(d).

14.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff William Schoenke purchased CAGC common stock during the Class Period and has suffered damages as a result.

16.     Plaintiff Heroca Holding B.V. purchased CAGC common stock during the Class Period and has suffered damages as a result.

17.     Plaintiff Ninella Beheer B.V. purchased CAGC common stock during the Class Period and has suffered damages as a result.

18.     Defendant CAGC is a Delaware corporation incorporated in 2004. During the Class Period, its principal executive offices were located at Room 3F, No. 11 Building, Zhonghong International Business Garden, Future Business Center, Chaoyang North Road, Chaoyang District, Beijing, China 100024, and a CAGC

subsidiary, CAI Investment Inc., a California corporation in good standing.  Based upon investigation of counsel, CAI Investment Inc. purportedly maintains office(s) located at 925 Mill Page Road, Palo Alto, California 94304-1013, 970 Wallace Drive, San Jose, California 95120, either or both.[4]

19.     CAGC, through its subsidiaries, purports to manufacture and sell organic compound fertilizers and related agricultural products in the PRC.

20.     To have its stock publicly traded in the United States, CAGC employed a device called a "reverse merger" in 2005. In a reverse merger, a publicly traded shell company acquires the private company seeking to go public.  In exchange, the shareholders of the former private company receive a controlling share of the public company.

21.     As a result of the reverse merger, CAGC became a holding company that primarily operates through its subsidiaries in the PRC.

22.     Defendant Chang was and is the Company's CEO, President, Secretary and, Chairman of the Board at all relevant times herein.  In addition, Defendant Chang was a substantial shareholder of the Company throughout the Class Period. When the Company filed its 2008 10-K and 2009 10-K, Defendant Chang owned 41.96% and 40.23% of the Company's stock, respectively.  Chang was and is the President of CACG's California wholly-owned subsidiary, CAI Investment Inc. Chang was also a 90% owner of CAGC's third largest supplier during the relevant time period.  *See* ¶ 82, *infra*.

23.     Defendant Yau-Sing Tang a/k/a Gareth Tang ("Tang") was the Company's Chief Financial Officer ("CFO") and Controller from October 2008 through January 16, 2012—when he suddenly resigned.  In addition, Defendant

---

[4]     *See* China Agritech, Inc., Annual Report, Ex. 21 (Form 10-K) (Apr. 2, 2007); *see also* California Sec. of State, Business Entities, http://kepler.sos.ca.gov (query "CAI Investment" after selecting "Corporation Name"; then follow "CAI Investment Inc." hyperlink).

Tang was a shareholder of the Company throughout the Class Period. When the Company filed its 2008 10-K and 2009 10-K, Defendant Tang owned 0.4% and 1.04% of the Company's stock, respectively.

24.     Defendant Gene Michael Bennett ("Bennett") was a director of CAGC from October 2008 through June 7, 2012—when he resigned. At all times during the Class Period, Bennett was the chair of CAGC's Audit Committee until his resignation from the Audit Committee on or about April 25, 2011, as well as a member of CAGC's Nominating and Governance Committee. After the CAGC Defendants' fraud was disclosed, Bennett was the chair of the Company's Special Committee investigating the allegations of fraud, until he resigned from the Special Committee on April 25, 2011.

25.     Bennett has served as an officer and/or director of numerous Chinese reverse merger frauds.  Bennett served as a director and CFO of Duoyuan Printing, Inc.—which is the target of an SEC investigation for filing materially false and misleading financial statements.

26.     Bennett also served as director of China Shenghuo Pharmaceutical Holdings—a company like Duoyuan, that was subject to civil securities class action lawsuits.  According to a March 30, 2011, Bloomberg BusinessWeek article, Bennett's biographies listed in certain SEC filings of companies where he was employed, misstated his qualifications.  Contrary to the descriptions, Bennett never worked with the accounting firm of Grant Thornton and he never received a law degree from the University of Michigan.  The misstated qualifications appeared in China Pharma Holdings, Inc.'s ("China Pharma") 2008 and 2009 10-K. Interestingly, China Pharma was represented by defendant Charles Law and his law firm, King & Wood, in connection with its securities' registration, and in 2011, China Pharma had to restate its financial statements for fiscal years 2009 and 2010.

27.     Defendant Xiao Rong Teng ("Teng") was and is a director of CAGC at all relevant times herein.   Teng also served as the Company's Chief Operating Officer ("COO") from February 2005 to March 2009.  Teng was also a director of Pacific Dragon since 2000, and a director of Tailong since 2003.  In addition, Teng was a substantial shareholder of the Company throughout the Class Period.  When the Company filed its 2008 10-K and 2009 10-K, Teng owned 2.53% and 2.15% of the Company's stock, respectively.

28.     Defendant Ming Fang Zhu ("Zhu") was CAGC's COO from March 2009 through May 27, 2011- when he resigned. From April 2007 to March 2009, Zhu served as President of Beijing Agritech Fertilizer Co, Ltd., an indirect subsidiary of the Company.

29.     Defendant Lun Zhang Dai ("Dai") was and is a director of CAGC at all relevant times. Dai also serves as a member of the Company's Audit Committee, Compensation Committee and Nominating and Governance Committee.   Dai is referred to in CAGC's SEC filings as Lun Zhang Dai and Lunzhang Dai.  Defendant Dai's daughter Lingxiao Dai also became employed by the Company on May 1, 2009 as Vice President of Finance, and has been the head of the Company's internal audit department since January 2010.

30.     Defendant Hai Lin Zhang ("Zhang") was a director of CAGC from October 2008 through March 13, 2012—when Zhang resigned.   Zhang also served as a member of the Company's Audit Committee, Compensation Committee and Nominating and Governance Committee during his entire tenure on the Board. Zhang is referred to in CAGC's SEC filings as Hai Lin Zhang and Hailin Zhang.

31.     Defendant Charles Law a/k/a Charles C. Law, Chien-Lee C. Loh, Charles Chien-Lee Law, and Charles Chien-Lee Loh. (together "Law") was a director of CAGC from January 2010 until his resignation in February 2011.  Law was appointed to the Board's Compensation Committee, and Nominating and

Governance Committee at the time he joined the CAGC Board. As set forth below, as a member of the Nominating and Governance Committee, Law was responsible for reviewing and approving related party transactions and therefore was fully informed as to such related party transactions.  According to the Company's SEC filings, Law is a qualified U.S. attorney who has an understanding of SEC compliance requirements.  In fact, in a filing with the SEC in January of 2006, CAGC described Law as "the Company's attorney."  *See* China Agritech, Inc., Current Report (Form 8-K, Ex. 10.3) (Jan. 16, 2006). Likewise, Law's law firm, King & Wood, represented CAGC in connection with CAGC's initial reverse merger registration.  It appears that Law and/or King & Wood have been involved with registration of many Chinese reverse merger companies.  In fact, in August of 2005, Law was a panel expert at the annual American Bar Association meeting called "Executing Multinational Acquisitions: Trends And Techniques In Getting The Far Flung Deal Done" and involved discussion of M&A Due Diligence for which he provided an outline of customary practice in China, a copy of which is attached hereto as Exhibit B.  *See* http://apps.americanbar.org/buslaw/newsletter/0041/materials/pp3.pdf   As a result of Law and his firm's intimate knowledge of CAGC as well as the proper structuring of reverse merger transactions for foreign corporations, he knew or should have known about the misconduct alleged herein and by doing so actively participated and/or concealed that misconduct throughout the Class Period.

32.    Defendant Zheng "Anne" Wang ("Wang") was a director of CAGC from December 2009 until March 14, 2011.  According to a Schedule 14A filed by CAGC with the SEC on July 21, 2010, Wang has been Vice-President of Carlyle Asia Growth Capital, a subsidiary of the private equity firm The Carlyle Group ("Carlyle"), since December 2007, and Wang was Carlyle's designee to CAGC's

board and was determined by the Board of Directors not to be an "independent director."

33.     Defendants Chang, Tang, Bennett, Teng, Zhu, Dai, Zhang, Law, and Wang are collectively referred to hereinafter as the "Individual Defendants."

## **PROCEDURAL HISTORY**

34.     Stockholders sued CAGC and its officers and directors concerning the issues related in this Complaint on two prior occasions and other stockholders commenced a derivative litigation in Delaware Chancery Court on behalf of the Company against members of its Board of Directors which were consolidated and remain pending.  In each of these cases, a court has denied defendants' motions to dismiss the pleading.

35.     Specifically, on February 2, 2011, Theodore Dean ("Dean"), on behalf of himself and all others similarly situated, filed a complaint against CAGC and several individual defendants, including members of CAGC's executive management team and board of directors.  *See Dean v. China Agritech, et al.*, Case No. CV 11-1331-RGK (C.D. Cal.) (the "*Dean* Action") (Dkt. 1).  On June 22, 2011, Mr. Dean filed an amended complaint, which added Slava Vanous, Randolph Daniels-Kolin, Clair Harpster, and Tan Tee Yong as plaintiffs.  *Id.*  (Dkt. 30).  It also added several additional individual defendants, Rodman and Renshaw, LLC, and Crowe Horwath, LLP, as defendants.  *Id.*  The amended complaint alleged claims for violations of: (1) Section 10(b) of the Exchange Act and SEC Rule 10b-5 against CAGC and all individual defendants; (2) Section 20(a) of the Exchange Act against the individual defendants; (3) Section 11 of the Securities Act of 1933 ("Securities Act") against all defendants; and (4) Section 15 of the Securities Act against the individual defendants.

36.     On October 27, 2011, Judge R. Gary Klausner of this Court granted in part and denied in part Defendants' motions to dismiss in the *Dean* Action.  *See*

Order Deny'g Mots. to Dismiss *Dean* Action (Dkt. 85) (Oct. 27, 2011).   Judge Klausner's order stated that the *Dean* Action's amended complaint sufficiently alleged Exchange Act claims against CAGC and the Individual Defendants while dismissing plaintiffs' Securities Act claims that were brought against these same defendants and the other defendants.  *Id.*

37.    Upon information and belief premised upon a review of the docket and conversations with the prior counsel representing plaintiffs in the *Dean* Action, on or about January 6, 2012, the *Dean* plaintiffs, by their counsel, moved to certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Pls.' Mot. to Certify Class, *Dean* Action (Dkts. 94-96).   On May 3, 2012, however, Judge Klausner denied the motion. *See* Order Deny'g Pls.' Mot. to Certify Class, *Dean* Action (Dkt. 134) (May 3, 2012).  In so ruling, Judge Klausner held that the *Dean* plaintiffs failed to satisfy the second and fifth factors under *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).  *Id.*   First, plaintiffs' expert failed to list the number of securities industry analysts that covered CAGC, therefore there was insufficient record evidence supporting a finding of market efficiency.  *Id.*   Second, the Court found that plaintiffs' two different experts came to separate conclusions concerning whether there was a causal relationship between CAGC's disclosures and movement in the price of its stock.  *Id.*   Accordingly, class certification was denied because plaintiffs failed to demonstrate that CAGC's stock traded on an efficient market, and, thus, plaintiffs were not entitled to the fraud-on-the-market presumption of reliance. *Id.*

38.    The *Dean* plaintiffs filed a Rule 23(f) of the Federal Rules of Appellate Procedure petition with the Ninth Circuit Court of Appeals seeking interlocutory review of the denial of class certification, but on August 8, 2012, the Ninth Circuit denied the *Dean* plaintiffs' petition.  *See* Order from the 9th CCA, *Dean* Action (Dkt. 164) (Aug. 8, 2012).

39.     On September 14, 2012, the plaintiffs entered into an agreement of settlement with defendants on an individual basis and the case was dismissed on September 20, 2012 by order of the Court.  *See* Stipulation of Settlement (Dkt. 204) and Order (Dkt. 205), *Dean* Action.

40.     Undeterred, on October 4, 2012, the same counsel as in the *Dean* Action filed a new complaint in the District of Delaware styled *Smyth v. Yu Chang, et al.,* 1:12-cv-01262, which alleged substantially the same claims on behalf of the same putative class as was alleged in the *Dean* Action (the "*Smyth* Action").  The *Smyth* Action subsequently was transferred to the Central District of California (s*ee* Order Grant'g CACG's Mot. to Transfer, *Smyth* Action (Dkt. 41, Apr. 19, 2013)), where it was eventually deemed related to the *Dean* Action and reassigned to Judge Klausner. *See* Order re Transfer Pursuant to Gen. Order 8-05, *Smyth* Action (Dkt. 54) (May 10, 2013).

41.     On July 18, 2013, Mr. Smyth, along with Te Gyun Kim, Premium Alliance Investment Limited, San Chul Han, HSP Investment Limited, and Seung Ho Lee filed an Amended Class Action Complaint against CAGC and members of its executive management team and board of directors alleging violations under the Exchange Act (the "Kim Group").  *See* Amended Compl., *Smyth* Action (Dkt. 76). And again, on September 26, 2013, Judge Klausner denied defendant China Agritech's motion to dismiss for substantially the same reasons related in the *Dean* Action's decision denying the motion to dismiss.  *See* Order Deny'g CACG's Mot. to Dismiss, *Smyth* Action (Dkt. 113).

42.     On the same day, however, Judge Klausner ruled on two competing motions seeking appointment as lead plaintiff (*see* Mots. for Appointment of Lead Pl. (DE Dkts. 4&5)) and the Kim Group's motion for class certification (*see* Mot. Class Cert. (DE Dkt. 85).  *See* Order Deny'g Mots., *Smyth* Action (Dkt. 112) (Sep. 26, 2013)   In denying the Kim Group's motion for class certification, Judge

Klausner found that the members of the group were inadequate class representatives and their claims were atypical because its members faced unique defenses.  *See id.* With respect to typicality, the Court ruled that since the members of the Kim Group were associated with the *Dean* plaintiffs and may have controlled the earlier movants' litigation strategy in part, whose claims were not certified, the defendants could avail themselves of the defense of claim preclusion.  *Id.*  Next, the Court found the members of the Kim Group and its chosen counsel inadequate.  *Id.*  The inadequacy of the Kim Group was founded on its members' failure to execute new plaintiffs' certification and their reliance on the certification filed over two years ago in the *Dean* Action.  *Id.*  Moreover, counsel's adequacy was questioned because it failed to serve defendants for years, communicate with the movants in a timely manner, and otherwise prosecute the case vigorously.  *See id.*

43.    On January 8, 2014, the parties once again executed a stipulation of dismissal even though on two prior occasions Judge Klausner sustained claims under the Exchange Act and twice declined to certify a class premised on a combination of suspect decision making by proposed plaintiffs' counsel, ineffective expert reports concerning market efficiency, and proposed class representatives who failed to properly execute the requisite paperwork demonstrate their standing and/or disclose their prior relationship with former movants who were not certified.  *See* Stip. to Dismiss Case, *Smyth* Action (Dkt. 135).  In short, class certification was denied twice based on avoidable errors, not because the claims were otherwise unfit for adjudication on a class wide basis.  *See* Order Grant'g Dismissal, *Smyth* Action (Dkt. 136) (Jan. 9, 2014).

44.    In addition to the actions pending in this federal court, a consolidated derivative action filed in Delaware Chancery Court on or about January 10, 2012, on behalf of the Company against certain of its officers and directors, amended on or about September 14, 2012, reached a settlement in November of 2014.  *See In re*

*ChinaAgritech, Inc. Shareholder Derivative Litig.*, Case No. 7163-VCL, Court of Chancery, State of Delaware (the "Derivative Action").

45.     On or about May 21, 2013, Vice Chancellor Laster denied defendants' motions to dismiss.  *See* Order Deny'g Defs.' Mots. to Dismiss, Derivative Action (Dkt. 145), a copy of which is attached hereto as Exhibit C.

## DEFENDANTS' MATERIAL OMISSIONS AND MISREPRESENTATIONS

### A.     The 2009 Q3 10-Q is False and Materially Misstated

46.     The Class Period begins on November 12, 2009 when the Company filed with the SEC its report for the third quarter of 2009 on Form 10-Q ("2009 Q3 10-Q") containing false and misleading financial statements.

47.     The false and misleading 10-Q was signed by defendants Chang and Tang. Chang and Tang also signed the accompanying Sarbanes-Oxley ("SOX") certifications, attesting to the accuracy of CAGC's financial statements.

48.     The 2009 Q3 10-Q was false because it materially misstated CAGC's revenue and net income for the quarter.

### B.     CAGC's 2009 10-K is False and Materially Misstated

49.     On April 1, 2010, the Company issued its fiscal 2009 annual report on form 10-K ("2009 10-K") containing false and misleading financial statements for fiscal years 2008 and 2009.

50.     The false and misleading 2009 10-K was signed by defendants Chang, Tang, Teng, Bennett, Dai, Zhang, Law and Wang. Defendants Chang and Tang signed the accompanying SOX certifications, attesting to the accuracy of CAGC's financial statements.

51.     CAGC's 2009 10-K described its revenue recognition policy as:

Sales revenue is recognized at the date of shipment from the Company's facilities to customers when a formal arrangement exists,

the price is fixed or determinable, the delivery is completed, ownership has passed, no other significant obligations of the Company exist and collectibility is reasonably assured.

52.    The 2009 10-K was false and materially misstated because: (i) It materially misstated the Company's revenue and net income for fiscal year 2008 and 2009; and (ii) it concealed material related party transactions.

**C.    CAGC Kept Two Materially Different Sets of Books and Reported Drastically Different Revenue and Income to the SEC and SAIC/SAT**

53.    The revenue and net income reported by CAGC with the PRC SAIC and SAT authorities for fiscal 2008 and 2009 are substantially less than that reported by CAGC with the SEC which CAGC investors relied upon, which demonstrates that the Company kept two materially different sets of books, reporting drastically different numbers to PRC authorities and U.S. investors.

54.    According to CAGC's SEC filings, in 2009 CAGC had four operating subsidiaries located in the PRC: Beijing Agritech, Pacific Dragon, Anhui Agritech, and Xinjiang Agritech.

55.    Plaintiffs' counsel obtained financial statements filed by the four subsidiaries with both the SAIC and SAT.

56.    The financials reported by each of CAGC's subsidiaries with the SAIC and SAT for *entire fiscal year* 2008 are substantially similar to each other, yet in total, all of their filings report revenue and income that are substantially less than the revenue and income CAGC reported in its 2008 10-K with the SEC.[5]

**2008 SAIC Financials**

| Subsidiary | Net Revenue | | Net Income | |
|---|---|---|---|---|
| Anhui Agritech | ¥ -615,501 | $ (89,799) | ¥ 3,853,674 | $ 562,236 |

---

[5]    Currency conversion of 6.95 CHY to $1.00 USD (the average spot close for 2008) was used for each of the charts in this paragraph.

- 14 -

| Beijing Agritech | ¥ -12,371,779 | $ (1,805,000) | ¥ 15,828,939 | $ 2,309,380 |
| Pacific Dragon | ¥ 3,935 | $ 574 | ¥ 535,629 | $ 78,146 |
| Xinjian Agritech | ¥ - | $ - | ¥ - | $ - |
| Total | ¥ -12,983,346 | $ (1,894,225) | ¥ 20,218,242 | $ 2,949,762 |

### 2008 SAT Financials

| **Subsidiary** | **Net Revenue** | | **Net Income** | |
|---|---|---|---|---|
| Anhui Agritech | ¥ -1,650,000 | $(237,410) | ¥ 210,000 | $30,215 |
| Beijing Agritech | ¥ -12,370,000 | $(1,779,856) | ¥ 15,820,000 | $2,276,258 |
| Pacific Dragon | ¥ -10,000 | $(1,438) | ¥ 530,000 | $76,259 |
| Xinjian Agritech | ¥ - | $ - | ¥ - | $ - |
| Total | ¥ -14,030,000 | $(2,018,704) | ¥ 16,560,000 | $2,382,733 |

57.     Therefore, in fiscal year 2008, the Company reported $45.24 million net revenue and $8.64 net income to the SEC, yet, the revenue it reported to the PRC SAIC and SAT was less than $3 million, with a net loss of more than ($1.89) million.

58.     As such, CAGC overstated its net income and fabricated a profitable fiscal year for 2008 while the Company was in fact losing money, as shown below:

| (In USD million) | SEC 2008 | SAIC 2008 | SAT 2008 | Amount of Overstatement from SAIC to SEC |
|---|---|---|---|---|
| Net Revenue | $45.24 | ($1.89) | ($2.02) | $47.13 |
| Net Income | $9.83 | $2.95 | $2.38 | $6.88 |

59.     Similarly, as set forth below, the financials reported by each of CAGC's subsidiaries with the SAIC and SAT for *entire fiscal year* 2009[6] are substantially similar to each other, yet in total, all of their filings report revenue and income that are substantially less than the revenue and income CAGC reported in its 2009 Q3 10-Q with the SEC alone.

**2009 SAIC Financials**

| Subsidiary | Net Revenue | | Net Income | |
|---|---|---|---|---|
| Anhui Agritech | ¥ 532,670 | $77,908 | ¥ -941,402 | $(137,688) |
| Beijing Agritech | ¥ 46,657,252 | $6,824,030 | ¥ 7,615,990 | $1,113,900 |
| Pacific Dragon | ¥ 583,828 | $85,390 | ¥-72,137 | $(10,551) |
| Xinjian Agritech | ¥ - | $ - | ¥ - | $ - |
| Total | ¥ 47,773,750 | $6,987,328 | ¥ 6,602,451 | $965,661 |

**2009 SAT Financials**

| Subsidiary | Net Revenue | | Net Income | |
|---|---|---|---|---|
| Anhui Agritech | ¥ 530,000 | $77,599 | ¥- 940,000 | $(137,628) |
| Beijing Agritech | ¥ 46,640,000 | $6,828,697 | ¥ 7,610,000 | $1,114,202 |
| Pacific Dragon | ¥ 580,000 | $84,919 | ¥-70,000 | $(10,249) |
| Xinjian Agritech | ¥ 3,820,000 | $559,297 | ¥ -250,000 | $(36,603) |
| Total | ¥ 51,570,000 | $7,550,512 | ¥ 6,350,000 | $929,722) |

| (In USD Million) | SEC Nine Months Ended Sept. 30, 2009 | SAIC for entire fiscal year 2009 | SAT for entire fiscal year 2009 |
|---|---|---|---|
| Net Revenue | $55.38 | $6.99 | $7.55 |
| Net Income | $12.83 | $0.97 | $0.93 |

---

[6]     Currency conversion of 6.83 CHY to $1.00 USD (the average spot close for 2009) was used for each of the charts in this paragraph.

60.    Therefore, for fiscal 2009, while the Company reported $76.13 million net revenue and $6.17 net income to the SEC, CAGC reported revenue to the PRC SAIC and SAT that was less than $7 million, with net income of less than $1 million, therefore overstating its revenue and net income for fiscal 2009 in its SEC filings, as shown below.

| (In USD million) | SEC 2009 | SAIC 2009 | SAT 2009 | Amount of Overstatement from SAIC to SEC |
|---|---|---|---|---|
| Net Revenue | $76.13 | $6.99 | $7.55 | $69.14 |
| Net Income | $6.17 | $0.97 | $0.93 | $5.2 |

61.    The financial statements filed by CAGC via its subsidiaries with the two PRC government authorities indicate the true financial performance of the Company because:

- Under PRC law, penalties for filing false SAIC filings include fines and revocation of the entity's business license.[7]
- If an entity's business license is revoked, the People's Bank of China[8] requires all bank accounts of that entity be closed.[9]

---

[7]    Order No. 23, Measures for the Annual Inspection of Enterprises (promulgated by the State Administration for Industry and Commerce, Feb. 24, 2006), at art. 20 (China), http://www.fdi.gov.cn/180000121_39_4741_0_7.html (hereafter "*Measures for the Annual Inspection of Enterprises*").

[8]    *See* The People's Republic Bank of China, http://www.pcb.gov.cn/publish/english/963/index.html (follow "About Us" hyperlink) (last visited June 23, 2014).

[9]    The People's Republic Bank of China, http://www.pcb.gov.cn/publish/english/963/index.html, at art. 49 (Apr. 25, 2003) (China) (follow "Rules & Regulations" hyperlink; then follow "Next" hyperlink;

- Without a business license the entity cannot legally conduct any business.[10]

- The financial statements CAGC filed in the PRC with the SAIC are required by law to be prepared according to PRC GAAP and audited by PRC CPA firms.[11]

- Under PRC law, filing false tax documents is a crime subject to severe criminal and civil penalties, including imprisonment.[12]

**D.    The Drastic Differences Between the Chinese and U.S. Filings Cannot be Explained by Different Accounting Treatment**

62.    Chinese Generally Accepted Accounting Principles ("PRC GAAP") and U.S. Generally Accepted Accounting Principles ("US GAAP") are substantially the same.  In particular, for revenue recognition for sales of goods, US GAAP, PRC GAAP and CAGC's stated revenue recognition policy are the same.

---

then follow first "Administrative Rules for RMB Bank Settlement Accounts 2003-04-25" hyperlink) (last visited June 23, 2014).

[10]    SAIC, *Mission* at No. 2 (promulgated by the State Administration for Industry & Commerce for the People's Republic of China) *available at* http://http://www.saic.gov.cn/english/aboutus/Mission/.

[11]    Agritech Fertilizer Limited's 2008 and 2009 financial statements filed with the SAIC were audited by Beijing Zhonghui Xingcheng CPA Firm and signed by Yu Chang.  Pacific Dragon Fertilizer Co., Ltd.'s 2008 and 2009 financial statements were audited by Heilongjiang Huaxin CPA Firm and signed by Yu Chang.  Xinjiang Agritech Agricultural Development Co., Ltd.'s 2008 and 2009 financial statements were audited by Xinjiang Runtong CPA Firm and signed by Yu Chang.  Anhui Agritech Development Co., Ltd.'s 2008 and 2009 financial statements were audited by Bengbu Tianyi CPA Firm and signed by Yu Chang.

[12]    Crimes Jeopardizing Administration of Tax Collection (promulgated by the Standing Comm. Nat'l People's Cong. July 1, 1979 and by Order No. 83 of the Pres. of the People's Republic of China, Mar. 14, 1997), art. 201 (1979) (China), *available at* http://www.npc.gov.cn/englishnpc/Law/2007-12/13/content_1384075.htm; *see also* Administration of Tax Collection (promulgated by the Standing Comm. Nat'l People's Cong., Apr. 28, 2001, effective May 1, 2011), art. 63 (2011) (China) *available at* http://english.gov.cn/laws/2005-09/12/content_31187.htm.

63.     First, authoritative bodies have specifically noted that there are no significant differences between PRC GAAP and US GAAP.  For example, the Committee of European Securities Regulators, in a paper entitled "CESR's advice on the equivalence of Chinese, Japanese and US GAAPs (2007)," noted that there were no significant differences between US GAAP and International Financial Reporting Standards ("IFRS").[13]

64.     There are no significant differences between IFRS and Chinese GAAP on revenue recognition.[14]  Thus, transitively, there are no significant differences between PRC GAAP or US GAAP with respect to revenue recognition.

65.     The law firm K & L Gates LLP has represented to the U.S. Securities & Exchange Commission in an October 27, 2010 letter that: "The basic accounting principles and practice of Chinese GAAP are similar to US GAAP. There are no substantial differences between Chinese GAAP and U.S. GAAP."[15]

66.     Thus, there are no significant differences between US GAAP and PRC GAAP that can explain the differences in CAGC's SAIC financial statements and those it filed with the SEC.

67.     The 2009 Q3 10-Q describes its revenue recognition policy as:

The Company's revenue recognition policies are in compliance with Staff Accounting Bulletin 104. Sales revenue is recognized at the date of shipment to customers when a formal arrangement exists, the price is fixed or determinable, the delivery is completed, no other significant obligations of our Company exist and collectibility is reasonably assured.

---

[13]     *See* http://www.iasplus.com/en/binary/europe/0712cesrequivalence.pdf at 25, 2nd entry on page.

[14]     *Id*. at 35, 6th entry on page.

[15]     China Agritech, Inc., Quarterly Report for Period Ended Sep. 30, 2009 (Form 10-Q) (Nov. 12, 2009)

The Company's revenue consists of the invoiced value of goods, net of a value-added tax ("VAT") and marketing rebate.

68.     The Chinese Accounting Standard for Business Enterprise ("ASBE") No. 14, governs revenue recognition for CAGC's PRC subsidiaries, and is similar. It states:

Chapter II Revenue from Selling Goods

Article   4.     No revenue from selling goods may be recognized unless the following conditions are met simultaneously:

(1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise;

(2) The enterprise retains neither continuous management right that usually keeps relation with the ownership nor effective control over the sold goods;

(3) The relevant amount of revenue can be measured in a reliable way;

(4) The relevant economic benefits may flow into the enterprise; and

(5) The relevant costs incurred or to be incurred can be measured in a reliable way.

69.     Accordingly, there are no significant differences between US GAAP and Chinese GAAP for recognizing revenue in CAGC's case, and such differences cannot account for the huge differences in revenue and income between CAGC's SEC filed financial statements and its SAIC and SAT statements.  Fraud is the only plausible explanation.

70.     According to its 2009 10-K, CAGC's main business is to "manufacture and sell organic liquid compound fertilizers, organic granular compound fertilizers and related agricultural products in the PRC…."  Thus, there is no other source of operating revenue and operating income other than those PRC subsidiaries, whose

financials are reported to PRC authorities in SAIC and SAT filings that have been combined for the purposes of the above comparisons with CAGC's SEC filings.

### E.   Plaintiffs' Investigation of CAGC's Factories Indicates Defendants' Engaged In Fraud

71.   CAGC's fraudulent revenue reporting has also been verified by Plaintiffs' investigators' site visits to CAGC's factories, which either sat idle with no production or operated substantially below capacity.

72.   According to Plaintiffs' investigator, CAGC subsidiary Beijing Agritech's factory was non-operational, with no significant operations.[16]

- Plaintiffs' investigators visited Beijing Agritech's factory in Pinggu, Beijing on a weekday in early June, 2011.  The investigators found no evidence of operations at the factory. The gate was locked. They did not see any movement of workers or machines through the window. There were no trucks or vehicles entering or exiting.

- When the investigators inquired to the gatekeepers about meeting with or talking to the sales department, they were refused entry to the factory.  Nor would the gatekeepers provide any contact information for factory management. The two gatekeepers said currently no officer or manager was in the factory and no one was expected in the factory for another month and that the gatekeepers were currently the only persons in charge of the whole factory.

- The investigators also visited the local government department that supervises and regulates CAGC's (and that factory's) business.  The department is known as the Administrative Committee of Beijing Xinggu Economic Development Zone.   This is the government

---

[16]     Though CAGC did not disclose in its SEC filings about annual production of Beijing Agritech, it did confirm in its February 10, 2011 Letter to Shareholders that the factory in Beijing is fully operational.

administrative organ that has responsibility for overall management of the economic zone in which CAGC's factory resides.  Plaintiffs' investigator interviewed the director of the General Administrative Office's Investment Promotion Division I, and was told by him that the Administration Committee's several requests for routine site visits were always refused, and they always kept their door shut.  The director also told Plaintiffs' investigator that "[a]ccording to them, most of their manufacturing activities were conducted in facilities elsewhere."

- Plaintiffs' investigators also visited the Beijing Xinggu District Administration of Quality and Technology Supervision, as the director of the General Administrative Office's Investment Promotion Division I had indicated this government body was in charge of issuing manufacturing permits for fertilizer.  At the Beijing Xinggu District Administration of Quality and Technology Supervision, the investigators were informed that while that office did not issue such permits, they could inquire as to such permits and they confirmed that CAGC did not apply for or receive any fertilizer manufacturing permits.

- In addition, Plaintiffs' investigator conducted a search on the website of the Beijing Municipal Administration of Quality and Technology Supervision and found that a fertilizer manufacturing permit is issued only when a company has passed all reviews and random inspections required.

73.  For Anhui Agritech, CAGC released pictures inside the factory in February 2011,[17] in an effort to rebut the negative facts in the report issued by the

---

[17]  *See*  http://brontecapital.blogspot.com/2011/02/china-agritech-more-miracles-in-plant.html.

Lucas McGee Research on February 2, 2011 (the "LM Report").[18]   Those pictures, however, show that the company did not have basic equipment, such as forklifts, necessary for operations. One picture showed that human laborers were used to move the 40kg (88lb.) fertilizer bags manually. Since this factory was reported to manufacture 100,000 tons of granular fertilizer annually, it means 37 workers have to move 2.5 million bags weighing 40kg each year (185 bags/day per person assuming they work 365 days a year), an impossible method of operation. [19]

74.   As to Xinjiang Agritech, it was not incorporated until December 2008. According to the LM Report, the Xinjiang Agritech plant is actually a warehouse, shared with two other companies and demonstrates no activity.

75.   In summary, CAGC materially overstated it production.

76.   In addition, financial statements filed by CAGC subsidiary Pacific Dragon with local SAIC show its revenue for 2008 and 2009 was only $76,811 and $85,294, respectively, far less than the purported annual rent stated in SEC filed financial statements in $518,940.

77.   There is no viable reason that any company would spend six times its revenue for rent expenses.

78.   Similarly, the financial statements filed by CAGC subsidiary Anhui Agritech with the local SAIC show its revenue for 2009 was only $77,941, far less than the purported annual rent of $432,900 reported in CAGC's SEC filings.

79.   As shown by the discrepancy between the PRC SAIC revenue, income and expenses, CAGC has been keeping two materially different sets of books, one for the PRC authorities and one for the SEC.

---

[18]   *See* LucasMcGee Research File, *China Agritech is a Scam* (Feb. 2011) *available at* http://lucasmcgeeresearch.files.wordpress.com/2011/02/china-agritech-a-scam.pdf. (hereafter "LM Report").

[19]   This educated estimate based on CAGC's total employees and production capacity of each subsidiary assumes a bag is moved only once following production.

**F.   Related Party Transactions**

80.   The 2009 10-K was false and misleading also because it concealed related party transactions with CAGC's CEO Chang.

81.   CAGC's third largest supplier - Shenzhen Hongchou – was 90% owned by CAGC CEO, President, Secretary and Chairman of the Board Defendant Chang at all relevant times until at least January 5, 2011, when he claims to have transferred his shares to another individual, Haibo Li.[20]

82.   US GAAP, Statement of Financial Accounting Standards ("SFAS"), and SEC regulations required the Company to disclose all material related party transactions.

83.   Statement of Financial Accounting Standards ("SFAS") No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions. . . ." SFAS No. 57 ¶ 2.[21]

84.   "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." *Id.*, at ¶ 1. "Affiliate" includes any company that is under common control or management with the public company. *Id.*, at ¶ 24(a, b).

85.   Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an

---

[20]   Perhaps not coincidentally, Ms. Haibo Li's mother is the owner of Harbin Hai Heng Chemical Dist. Co., another principal supplier to CAGC (supplying 17% of CAGC's raw materials).

[21]   *See* http://www.fasb.org/cs/BlobServer?blobkey=id&blobnocache=true& blobwhere=1175820909171&blobheader=application%2Fpdf&blobheadername2=C ontent-Length&blobheadername1=Content-Disposition&blobheadervalue2=145875 &blobheadervalue1=filename%3Dfas57.pdf&blobcol=urldata&blobtable=MungoBl obs

understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. *Id.*, at ¶ 2.

86.   PRC GAAP is substantially the same as GAAP as they both require disclosure in the financial statements of related party transactions.  The definition of related parties is the materially the same under PRC GAAP (specifically, ASBE No. 36 – Disclosure of Affiliated Parties) as per SFAS 57.  A translated copy of ASBE 36 is attached as Exhibit D hereto.

87.   SEC Regulations also require disclosure of related party transactions. SEC Regulation S-K ("Reg. S-K") (together with the General Rules and Regulations under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the Exchange Act and the forms under these Acts) states the requirements applicable to the content of the non-financial statement portions of the annual reports on form 10-K, quarterly reports on form 10-Q and proxy statements on from 14A. (*See*, Reg. S-K, 17 CFR §229.10 (2014)).

88.   Reg. S-K required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."  17 CFR § 229.404 (Item 404) (a).

89.   Reg. S-K also required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.  17 CFR § 229.404 (Item 404) (a)(1-6).

90.     A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.   17 CFR § 229.404 (Item 404(a)(1)(a)).

91.     In its May 14, 2009 10-Q, CAGC attached a contract dated December 8, 2008 between CAGC's subsidiary Pacific Dragon Fertilizer Co., Ltd. and Shenzhen Hongchou in which CAGC's subsidiary promised to purchase 26.9 million RMB ($4.0 million) of raw materials from Shenzhen Hongchou. [22]

92.     According to CAGC's 2009 and 2008 Form 10-Ks, CAGC purchased 15% and 14.7% of its raw materials from Shenzhen Hongchou in fiscal 2009 and 2008.

93.     CAGC, however, did not disclose that 90% of Shenzhen Hongchou's shares were owned by CAGC CEO, President, Secretary and Chairman defendant Chang and/or that the above purchases were related party transactions.

94.     Shenzhen Hongchou's SAIC filings show that Chang has owned 90% of its shares since August 2004, while Ms. Haibo Li owned the remaining 10%.

95.     In addition, Haibo Li's sister works for Pacific Dragon, the CAGC subsidiary that signed the related party contract with Shenzhen Hongchou.

96.     The SAIC filings also show that Shenzhen Hongchou's annual revenue was only $4,822.00 (RMB 33,269.23) in fiscal 2008, substantially less than CAGC's purported purchases from it.

97.     Notably, CAGC reported in the 2009 10-K that "[w]e purchase the majority of our raw materials from suppliers located in the PRC and use suppliers that are located in close proximity to our manufacturing facilities, which helps us to

---

[22]     China Agritech, Inc., Quarterly Report for Period Ended Mar. 30, 2009, Ex. 10.3 *Industrial Product Purchase Contract No. 090001* (Form 10-Q) (May 14, 2009)

contain our cost of revenue." Shenzhen Hongchou, however, is not close to Pacific Dragon Fertilizer Co., Ltd. or to any of CAGC's subsidiaries. The closest CAGC subsidiary to Shenzhen Hongchou is Anhui Agritech, which is more than 1,300 km (808 miles) away. Pacific Dragon is more than 3,000 km (1,864 miles) from Shenzhen Hongchou.

98.    The only reason for CAGC to choose Shenzhen Hongchou as its major supplier is to personally benefit its majority owner, CAGC's CEO, President, Secretary and Chairman of the Board defendant Chang.

### G.    CAGC's Other Suppliers Raise Serious Questions

99.    According to CAGC's 2009 10-K, Beijing Zhongxin Chemical Technology Development Co. ("Beijing Zhongxin"), was its largest supplier. CAGC purchased 18% and 13.2% of its raw materials from it in fiscal years 2009 and 2008, respectively.  On December 2, 2008, CAGC's subsidiary Pacific Dragon Fertilizer Co., Ltd. signed a contract to purchase 59.6 million RMB ($8.7 million) of raw materials (fulvic acid) from Beijing Zhongxin.[23]

- After extensive government database searches and website searches in all possible transliterated Chinese names, Plaintiffs' investigator could not find such company.[24]  Plaintiffs' inquiry with a credit agency also found no records of any such company with the Beijing Administration for Industry & Commerce.  Plaintiffs believe Beijing Zhongxin does not exist or if it does exist in some form, it is a non-operational shell company.

---

[23]    *See id., supra,* at n.21.

[24]    The LM Report also questioned CAGC's mysterious suppliers because those companies "cannot be found in any directory under possible Chinese names that would correspond to the transliterated names or under the alphabetic names." However, in its response, CAGC still did not disclose the suppliers' Chinese names. It only referred to the link of its SEC filings where only English names were disclosed.  It appears Defendants did not disclose the Chinese names because one of the suppliers was owned by CEO/Chairman/President Chang and he did not want to be discovered, while the other supplier does not exist.

- If Beijing Zhongxin does exist, it should be an important and well-known player in the market for fertilizer raw materials since it has millions of dollars in annual sales. It is unlikely that CAGC is its only customer.

- Therefore, Plaintiffs' investigator believes that Beijing Zhongxin does not exist and may be a front to siphon funds from CAGC.

100. According to CAGC's 2009 10-K, Harbin Hai Heng Chemical Distribution Co., Ltd., ("Harbin Hai Heng") was its second largest supplier. On December 5, 2008, CAGC's Pacific Dragon subsidiary signed a contract with Harbin Hai Heng to purchase 43.4 million RMB ($6.0 million) of raw materials from Harbin Hai Heng.[25] CAGC purchased 17% and 12% of raw materials from Harbin Hai Heng in fiscal 2009 and 2008, respectively.

- However, Harbin Hai Heng's PRC SAIC records show that this company did not participate in the mandatory annual inspection for fiscal year 2008 and 2009, implying that it has been a non-active business since 2007. Failing to file the annual inspection will not only bring substantial penalties, but also the risk of revocation of the entity's business license.[26] Without a business license, a company cannot conduct any business in the PRC or even maintain a bank account.

- Harbin Hai Heng is a shell company. According to a credit report issued by Qingdao Inter-Credit Services Pte Co., Ltd. ("Qingdao"), a reputable credit reporting agency in China, Harbin Hai Heng has no known phone number, no website, no information obtainable online and no determinable business

---

[25]    *See* China Agritech, Inc., Quarterly Report for Period Ended Mar. 30, 2009, Ex. 10.4 *Industrial Product Purchase Contract No. 090003* (Form 10-Q) (May 14, 2009).

[26]    *Measures for the Annual Inspection of Enterprises, supra,* at n.6.

operations. These facts have also been verified by Plaintiffs' investigator through extensive database searches.

- Furthermore, Harbin Hai Heng is owned by Guirong Yin who is the mother of Ms. Haibo Li, Chang's business partner in Shenzhen Hongchou, the third largest supplier of CAGC -- which was 90% owned by Chang until January 2011 when Chang transferred his 90% interest to Haibo Li. Haibo Li's sister is a branch manager for CAGC subsidiary Pacific Dragon which signed the $4.0 million contract with Shenzhen Hongchou. Beyond these entanglements, Defendant CEO Chang's full relationship with the Li family is not yet known.

101. According to CAGC's 2009 10-K, Langfang Tong Chuang Industrial and Trading Company Ltd ("Langfang Tong Chuang") was its fourth largest supplier, and CAGC purchased 13% of its raw materials in 2009 from Langfang Tong Chuang.

- Langfang Tong Chuang's PRC SAIC records show that this company's business scope is limited to "sales of paper, daily grocery, iron powder, construction materials, steel, auto parts, and plastic products and machining." None of CAGC's reported purchases of nitrogen, phosphorus and kalium or any similar chemical material is included within the scope of allowable business operations.
- According to PRC regulations, a company's registered business scope is determined by its Articles and monitored by local authorities. A company is not allowed to conduct any business beyond the registered scope without amendment to its Articles and SAIC registration, unless specifically approved by the SAIC.[27]

---

[27] Company Law (promulgated by the Standing Comm. Nat'l People's Cong.), arts. 11, 20 (China) *available at* http://china.org.cn/government/207344.htm.

- Langfang Tong Chuang's SAIC records do not show any approval for the manufacture, sale or distribution of raw materials for fertilizer.

- Furthermore, its SAIC filings show that the company's revenue was $208,370 and $216,350 for the fiscal year 2009 and 2008, respectively,[28] substantially less than CAGC's purported purchase from it.

102.   There is no plausible legitimate business explanation for CAGC's payments to Beijing Zhongxin, Harbin Hai Heng and Langfang Tong Chuang as these three purported suppliers clearly did not provide raw materials to CAGC in the amounts reported by CAGC.

103.   Furthermore, because operating capital is very scarce in China, it is not the general business practice to provide suppliers with large cash advances.  Yet, CAGC made huge cash advances to its suppliers for the future purchase of raw materials. According to CAGC's Form 10-K filed for fiscal year 2009, total cash advances made to its suppliers amounted to $25.35 million in 2009 and $10.8 million in 2008.

**ADDITIONAL FACTS SUPPORTING LIABILITY**

A.   ***The Audit Committee Charter***

104.   According to the Company's audit committee charter adopted on October 22, 2008, members of the audit committee have the responsibility to, among other things:

a.   "…. (a) assist the Board's oversight of (i) the integrity of the Company's financial reporting process and system of internal controls…";

b.   "Review and discuss with management and the independent auditors, before filing with the Securities and Exchange Commission, the annual audited financial statements and quarterly financial statements.

---

[28]   Exchange rate for 2008 is RMB 6.9: USD 1, for 2009 is RMB 6.8: USD 1.

Review with the independent auditors and management the results of the audit and the Company's specific disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations.' Discuss matters required to be communicated to Audit Committee in accordance with Statement on Auditing Standards No. 61."; and

c. "With the independent auditors, management and the internal auditors, periodically review and discuss significant (a) financial reporting issues and practices, and critical accounting policies and estimates (b) issues regarding accounting principles and financial statement presentation (including any significant changes in the Company's selection or application of accounting principles) and (c) issues as to the adequacy of the Company's internal control systems and compliance with applicable laws and regulations. Assess management's attitude toward internal controls, the process for establishing and monitoring internal control systems and any special audit steps adopted in light of material control deficiencies."

105.   According to CAGC's 2009 10-K, the audit committee was comprised of Defendant Bennett, Dai and Zhang, with Bennett serving as the Chairman. Bennett was also determined by the board of directors to be the necessary audit committee member that qualifies as an ''audit committee financial expert."

106.   Defendant Bennett, Dai and Zhang as members of the audit committee had an affirmative duty of oversight and responsibility for the integrity of CAGC's financial reporting.

**B.** ***CAGC's Code of Ethics Acknowledges Related Party Transactions Should be Avoided***

107.   The Company's Code of Ethics, adopted by the Company on April 12, 2006 – which CAGC's officers and directors presumably promised to adhere to, and

which CAGC's 2006 10-KSB provides applies to its CEO, CFO, Controller and "any person who may perform similar functions" - prohibits self-dealing transaction such as those engaged in by defendant CEO Chang:

> The chief executive officer, chief financial officer, comptroller, chief accounting officer or persons performing similar functions (collectively, "Senior Financial Officers") hold an important and elevated role in corporate governance. Senior Financial Officers fulfill this responsibility by prescribing and enforcing the policies and procedures employed in the operation of the enterprise's financial organization, and by demonstrating the following:
>
> I. Honest and Ethical Conduct
>
> Senior Financial Officers will exhibit and promote the highest standards of honest and ethical conduct through the establishment and operation of policies and procedures that:
>
> - **Prohibit and eliminate the appearance or occurrence of conflicts between what is in the best interest of the enterprise and what could result in material personal gain for a member of the financial organization, including Senior Financial Officers.**

CAGC Form 10-KSB, filed April 14, 2009, Exhibit 10.14 (emphasis added).

### C. *The Nominating and Governance Committee Charter*

108.   CAGC's Nominating and Governance Committee Charter provides that the Nominating Committee members (including Defendants Bennett, Zhang, Dai and Law) had an additional responsibility to review and approve related party transactions.   Specifically, the charter provides that the Nominating Committee shall, *inter alia*:

> Review and determine whether to approve any transaction in which the Company or its affiliates is a participant (whether directly or indirectly) with any director or employee of the Company or any of

their family members or affiliates after learning all material facts, including the potential for a conflict of interest, and in accordance with applicable law.

Provided however, the Committee may delegate authority to the Chief Financial Officer [to] review and approve any transaction up to U.S. $10,000 in which the Chief Financial Officer does not have a direct or indirect interest.

109.   Despite these obligations, the defendant members of the Nominating and Governance Committee approved related party transactions which the Company failed to disclose in the 2009 10-K signed by defendants Chang, Tang, Teng, Bennett, Dai, Zhang, Law and Wang, as more fully discussed above in section __, *supra*.

110.   Indeed, as a result of their positions and failure to fulfill their duties as directors, including the fact that auditors were terminated, the Company failed to file required periodic financial reports, and the Company stock was delisted, claims against the Individual Defendants (including Defendant Law) were all upheld on a Rule 12(b)(6) motion in the derivative action:

Defendant Law served as a director of the Company from January 8, 2010 until February 10, 2011. During their tenures, the Company engaged in the Offering, suffered the problems that led to the terminations of Crowe Horwath and Ernst & Young, failed to file any periodic filings required by the federal securities laws, and was delisted by NASDAQ. For purposes of Rule 12(b)(6), it is reasonable to infer that Teng, Y. Tang, Zhu, Wang, and Law knew about the oversight problems and failed to stop them. At a later stage of the case, I will take into account Wang and Law's resignations, which could well serve to limit their potential liability for events described in the Complaint that post-date their board service. *See In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476-CS, at 15-17 (Del. Ch. Feb. 6, 2013) (TRANSCRIPT). But because Wang and Law will remain in the case regardless as to certain claims, I will not attempt to parse the implications of their resignations at the pleadings stage.

Exhibit C attached at p. 48.

**D.** *Defendants Approved a Secondary Offering with No Oversight*

111.   In April 2010, CAGC announced a public offering of 1,243,000 shares of its common stock, plus an underwriter's option on 186,450 additional shares, which was exercised.   The Prospectus included "Selected Financial Data" that repeated the materially inaccurate and misleading financial statements filed with the SEC for fiscal years 2008 and 2009, and stated that the purpose of the offering, which raised a total gross proceeds of $23 million, was to finance the construction of "distribution centers" for CAGC products.   As alleged above, there is no evidence that CAGC ever began any such construction.

112.   The Individual Defendants then on the Board (defendants Chang, Tang, Teng, Bennett, Dai, Zhang, Law and Wang) approved and conducted the offering without making the slightest effort to ensure that the proceeds of the offering were used as represented, signed the prospectus filed with the SEC in October of 2010 for the offering, and therefore made such statements knowing them to be false.   *See* China Agritech, Inc., Current Report (Form 8-K, Ex. 99.1) (April 28, 2010); China Agritech, Inc., Current Report (Form S-3) (October 19, 2010).

**E.     *Respondeat Superior Liability***

113.   CAGC is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

114.   The *scienter* of the Individual Defendants and other employees and agents of the Company is similarly imputed to CAGC under *respondeat superior* and agency principles.

## THE TRUTH ABOUT CAGC'S FINANCIAL STATEMENTS SLOWLY ENTERED THE MARKET THROUGH

- 34 -

## **PIECEMEAL DISCLOSURES CAUSING THE PRICE OF**
## **CAGC STOCK TO DROP**

115.   On February 3, 2011, the LM Report published by research firm LM Research, and entitled "China Agritech: A Scam," asserted that China Agritech was a fraud.[29]

116.   The Report asserted that the Company's financial statements were fraudulent due to overstated revenue, and that the Company's factory plants are idle.

117.   The adverse news disclosed by the LM Report caused the Company's stock to decline from its closing price of $10.78/share on February 2, 2011 to $9.12/share before closing at $9.85/share on February 3, 2011 — a day over day decline of 8.63%.

118.   The next day, CAGC vigorously denied the allegations made in the LM report. The response only helped recovery of the stock price by $0.14/share or 1%. Ironically, Charles Law, one of CAGC's Board of Directors, resigned shortly thereafter.

119.   CAGC continued to deny the allegations of fraud publicly.  Yet, as a result of the allegations of fraud, several analyst firms downgraded CAGC, causing a selloff and declines in its share price.

120.   On February 7, 2011, analyst firm Brean Murray downgraded CAGC, and Rodman & Renshaw placed CAGC's rating under review as a result of the allegations of fraud in the LM Report.

121.   On February 8, 2011, analyst firm Chardan Capital lowered its price target for CAGC to $5, and based on a lack of credibility in management, rated CAGC a sell.

---

[29]   *See* LM Report, *supra,* at n.17.

122. On February 15, 2011 Bronte Capital issued a scathing report presenting additional facts indicating that CAGC was a fraud and could not possibly have produced the revenue it claimed in its financial statements.[30]

123. As a result of the Bronte Capital report, CAGC stock price dropped from $9.81/share on February 7, 2011 to $7.44/share on February 16, 2011 – more than 19% - on extremely heavy volume of over 2.8 million shares.

124. A month later, on March 13, 2011,[31] CAGC announced formation of a Special Committee of its Board of Directors ("the Special Committee") to investigate the allegations of fraud made by third parties.[32]

125. The next day CAGC dismissed Ernst & Young Hua Ming as the Company's independent auditor citing the following reasons as disclosed in the 8-K filed on March 18, 2011:

> On November 13, 2010, China Agritech, Inc. (the "Company") appointed Ernst & Young Hua Ming ("E&Y") as its independent registered public accounting firm. On March 14, 2011, the Company terminated the services of E&Y.
>
> … On December 15, 2010, E&Y provided a letter to the Audit Committee of the Board of Directors of the Company (the "Audit Committee") describing certain matters that, if not appropriately addressed in a timely manner, may result in audit adjustments, significant deficiencies or material weaknesses and/or delays in meeting the 10-K

---

[30] *See* http://brontecapital.blogspot.com/2011/02/china-agritech-chinas-amazing.html.

[31] Given that the last day of active trading prior to CAGC's announcement on Sunday March 13, 2011 regarding potential fraud was Friday March 11, 2011, that is the last day of the Class Period.

[32] *See* China Agritech, Inc., Current Report, Ex. 99.1 *Press Release (Mar. 13, 2011)* (Form 8-K) (Mar. 16, 2011).

filing deadline. … On March 8, 2011, E&Y informed the Audit Committee that it had encountered additional issues and concerns that, in E&Y's view, required additional information and procedures, **including the initiation of an independent investigation, in order to verify certain transactions and balances recorded on the Company's financial statements and records for the year ended December 31, 2010**. **E&Y also orally advised the Audit Committee that it may not be able to rely on management's representations based on the issues identified.**

\*    \*    \*

**E&Y informed the Company that the issues identified in performing their audit may, if further investigated, have adverse implications for the financial statements covering the three quarterly reports filed by the Company on Form 10-Q during 2010,** and advised the Audit Committee to inform the predecessor auditors of the issues identified, so that they can assess the impact on prior financial reports.

*See id.*, *supra*, at n.31 (emphases added).

126.  On March 15, 2011, the day after CAGC terminated E&Y, E&Y sent defendants Chang and Bennett a letter "to satisfy [E&Y's] obligations under Section 10A(b)(2) of the Securities Exchange Act of 1934," which requires an independent auditor to make a report to the board of directors if the auditor concludes that an "illegal act" has occurred, that "the illegal act has a material effect on the financial statements of the issuer," and "the senior management has not taken, and the board of directors has not caused senior management to take, timely and appropriate remedial actions with respect to the illegal act."

127.  E&Y's March 15, 2011 letter detailed the meetings and events which had transpired prior to E&Y's termination, including:

On March 8, 2011, we met with the Audit Committee of China Agritech, Inc. to discuss potential violations of law including United States securities laws in respect of issues identified during the performance of our audit work to date, including but not limited to: goods delivery notes that appeared to be modified after the fact; time sheets and related data for the Harbin facility that appeared to be destroyed; material purchases apparently made without supporting official tax invoice or with duplicate official tax invoice; a tax notice from the Harbin City tax bureau that appeared to be falsified; and what appeared to be material undisclosed related party transactions. At the end of the meeting, we requested the Audit Committee to take timely and appropriate remedial action.

Also during the March 8, 2011 meeting, we advised the Audit Committee that we believed that what predecessor auditors had concluded was a significant control deficiency potentially represents a material accounting error that may require restatement of the Company's Forms 10-Q filed during 2010.

On March 10, 2011, we met again with the Audit Committee, and we were advised that in response to the issues identified in our audit, a Special Investigation Committee of the Board of Directors would be formed and chaired by an independent director, Zheng Wang, and that a public announcement would promptly be made. . . .

On March 12, 2011, Company management approved a press release that disclosed that the Special Investigation Committee was formed in response to allegations made by third parties with respect to the Company and certain related issues "identified in connection with the performance of the Company's year end audit."

On March 13, 2011, the press release was issued to the public, but the disclosure above relating to issues "identified in connection with the performance of the Company's year end audit" was deleted. We understand that the deletion was made in order to avoid a public statement connecting the investigation to the audit. We notified Mr. Frank Marino of Loeb & Loeb, the Company's legal counsel, on that same day that we believed the deletion of the reference to the audit

issues was a material omission from the press release, and we requested that the Company promptly issue a new press release to rectify this omission. We also advised the Company's legal counsel that Ernst & Young Hua Ming would resign as the Company's auditors if the corrective press release was not made. No correcting press release was ever made.

On March 14, 2011, we were advised by letter from the Company's CEO and Board Chairman that the Audit Committee of the Board of Directors had approved the termination of Ernst & Young Hua Ming as auditors. We had received no prior notice that the Company was considering our termination as auditors, and we have no reason to believe such termination was under consideration prior to our advising the Company of their need to correct the press release.

Later in the day on March 14, 2011, the Company issued a press release stating that the termination of Ernst & Young Hua Ming as auditors "was the result of Ernst & Young (China) Advisory Limited Beijing Branch Office entering into a SOX 404 service agreement including performing the test of the Company's internal controls from 2008 through 2010. Recently, the public and the management team have raised doubts about this service agreement's impact on Ernst & Young Hua Ming's independence to act as the Company's auditor. In order to give the public fair and truthful financial results, the Board of Directors came to the above decision."

The independence implications of the Section 404 services were fully considered by both the Company and Ernst & Young Hua Ming prior to our engagement as auditors, and were thereafter discussed by us in our letter dated November 13, 2010 to the Audit Committee as required by PCAOB Rule 3526. Following our communications with the Audit Committee, the Audit Committee Chairman confirmed to us that he shared our conclusion that these matters did not impair our ability to serve as the Company's independent auditors. . . . Nothing has taken place that would change our original conclusions with respect to our independence.

We believe the Company's March 14, 2011 press release describing independence as the reason for our termination does not reflect the

Company's actual reasons for terminating Ernst & Young Hua Ming as the Company's auditors.

On March 15, 2011, we were notified that Zheng Wang, your Board member and chair of the Special Investigation Committee had resigned from her position on the Board of Directors.

These events cause us to believe that the Company's Audit Committee has failed to cause the Company's senior management to take timely and appropriate remedial actions with respect to the matters communicated to the Audit Committee during our meeting on March 8, 2011. Similarly, these events cause us to believe that the Audit Committee has failed to cause the Company's senior management to take timely and appropriate remedial action with respect to material omissions or inaccuracies with respect to its public statements.

128.   The Audit Committee's purported revelation on March 14, 2011 – just six days after E&Y informed the committee of, among other serious concerns, "potential violations of law" – that E&Y was purportedly insufficiently independent to serve as CAGC's independent auditors has no foundation given that had been performing SOX 404 consulting and testing services for CAGC for three years, and the Audit Committee had confirmed as recently as November 2010, when the Company first retained E&Y as its independent auditors, that E&Y was sufficiently independent to serve as CAGC's independent auditors. The Audit Committee's "independence" concern was a pretense to dismiss E&Y and avoid addressing the serious financial reporting problems E&Y identified.

129.   Moreover it appears clear from C&Y's March 15, 2011 letter that CAGC's prior auditor, Crowe Horwath, had identified a "significant control deficiency" prior to being dismissed by CAGC on November 13, 2010, yet this information was never disclosed to CAGC shareholders.

130.   Thus, CAGC had concealed that E &Y had identified serious problems with its financial statements as early as December 15, 2010 and had informed

CAGC's board that an internal investigation was necessary.[33] CAGC had misled investors to believe that the investigation was not connected at all with E&Y's audit and concealed that E&Y had demanded the internal investigation as a result of serious issues with CAGC's financial statements. But CAGC failed to correct the problems with the financial statements, failed to provide verification for certain transactions – prompting "**E&Y [to] . . . orally advise[] the Audit Committee that it may not be able to rely on management's representations based on the issues identified.**"

131.   Thus, the March 14, 2011 press release shocked investors by disclosing that Defendants had concealed that E&Y had insisted that the board commence an investigation and that Defendants had concealed that the failure of CAGC to file its 10-K timely was a result of accounting problems that E&Y had identified back in December 2010 –leading to the investigation.  Thus, investors learned for the first time that E&Y had identified problems with CAGC's financial statements.  This news crushed any remaining credibility CAGC management had because E&Y stated it could not rely on management's representations.

132.   Also on March 14, 2011, the Nasdaq delisted and halted trading in CAGC stock with its share price at $6.88/share.

133.   Then, Defendant Wang, a member of the Company's Board of Directors, as well as a member of the special committee of the Board of Directors, resigned without a word.

134.   On May 20, 2011, CAGC stock opened for trading on the pink sheets at $1.50/share having dropped $5.38/share from its previous pre-halt trading price. CAGC shares traded as low as $1.00/share before closing for trading at $3.80/share.

---

[33]   After retaining a law firm and accounting firm to conduct the investigation, CAGC has still not disclosed the results of the investigation.

The next trading day, CAGC shares dropped another $0.80/share to $3.00/share on heavy trading.

135.   The share price decline on May 20 and 23 was a direct result of the negative news concerning E&Y disclosed on March 14, 2011 and the resignation of defendant Wang as a director, who had served as a representative of Carlyle – further eliminating any credibility for CAGC.

136.   CAGC shares were valued at $0.16/share as of October 16, 2012.

137.   Thus investors have seen the value of their shares drop from $10.78/share on February 2, 2011 when the fraud was first disclosed to $0.16/share as of October 16, 2012 – a loss of $10.62/share – almost all of their value.

## ADDITIONAL FACTS SUGGESTIVE OF SCIENTER

### A.    Defendants' Stock Sales Demonstrate Scienter

138.   Defendants have also profited handsomely from sales of CAGC stock. This demonstrates that defendants had a strong profit motive to inflate the stock price by overstating its financials.

139.   CAGC filed a prospectus with the SEC on May 4, 2010 registering large amounts of CAGC stock owned by Defendants for sale.  While it is not clear exactly how much stock each Defendant sold pursuant to the Registration Statement, Defendants were each motivated, and intended, to sell CAGC stock and earn tens of millions in profits.

140.   Scienter is also supported by fact that CAGC was able to conduct an equity offering to take advantage of CAGC stock's artificially inflated price. In May, 2010, CAGC sold over 1.429 million shares of its stock at $16.10/share raising approximately $23 million; along with the exercise of warrants, CAGC raised an additional $10 million.

141.   Defendants Teng, Tang and Zhu all profited handsomely from sales of CAGC stock during the period of the fraud.  A list of their specific CAGC share sales are as follows.

142.  Defendant Xiaorong Teng, a Director and COO, engaged in the following sales during the Class Period:

| Date | # Shares | Price/Share | Proceeds |
|---|---|---|---|
| 05/13/10 | 10,000 | $16.94 | $169,400.00 |
| 05/26/10 | 302 | $12.84 | $3,877.68 |
| 05/26/10 | 300 | $12.83 | $3,849.00 |
| 05/26/10 | 99 | $12.82 | $1,269.18 |
| 05/26/10 | 800 | $12.81 | $10,248.00 |
| 05/26/10 | 474 | $12.80 | $6,067.20 |
| 05/26/10 | 1,783 | $12.79 | $22,804.57 |
| 05/26/10 | 2,019 | $12.78 | $25,802.82 |
| 05/26/10 | 4,223 | $12.77 | $53,927.71 |
| 06/01/10 | 900 | $12.95 | $11,655.00 |
| 06/01/10 | 319 | $12.93 | $4,124.67 |
| 06/01/10 | 2,300 | $12.90 | $29,670.00 |
| 06/01/10 | 300 | $12.89 | $3,867.00 |
| 06/01/10 | 400 | $12.88 | $5,152.00 |
| 06/01/10 | 100 | $12.88 | $1,287.50 |
| 06/01/10 | 2,881 | $12.87 | $37,078.47 |
| 07/23/10 | 1,000 | $12.29 | $12,290.00 |
| 07/23/10 | 400 | $12.28 | $4,912.00 |
| 07/23/10 | 300 | $12.27 | $3,681.00 |
| 07/23/10 | 700 | $12.26 | $8,582.00 |
| 07/23/10 | 1,100 | $12.25 | $13,475.00 |
| 07/23/10 | 900 | $12.24 | $11,016.00 |
| 07/23/10 | 700 | $12.22 | $8,554.00 |
| 07/23/10 | 1,225 | $12.20 | $14,945.00 |
| 07/23/10 | 200 | $12.19 | $2,438.00 |
| 07/23/10 | 475 | $12.18 | $5,785.50 |
| 07/23/10 | 2,400 | $12.17 | $29,208.00 |
| 07/23/10 | 850 | $12.16 | $10,336.00 |
| 07/23/10 | 1,230 | $12.15 | $14,944.50 |

| Date | # Shares | Price/Share | Proceeds |
|---|---|---|---|
| 07/23/10 | 1,000 | $12.14 | $12,140.00 |
| 07/23/10 | 350 | $12.13 | $4,245.50 |
| 07/23/10 | 200 | $12.12 | $2,424.00 |
| 07/23/10 | 870 | $12.10 | $10,527.00 |
| 07/23/10 | 300 | $12.08 | $3,624.00 |
| 07/23/10 | 100 | $12.07 | $1,207.00 |
| 07/23/10 | 1,300 | $12.06 | $15,678.00 |
| 07/23/10 | 400 | $12.05 | $4,820.00 |
| 07/23/10 | 200 | $12.04 | $2,408.00 |
| 07/23/10 | 700 | $12.03 | $8,421.00 |
| 07/23/10 | 1,600 | $12.02 | $19,232.00 |
| 07/23/10 | 200 | $12.01 | $2,402.00 |
| 07/23/10 | 1,355 | $12.00 | $16,260.00 |
| 07/23/10 | 300 | $11.99 | $3,597.00 |
| 07/23/10 | 500 | $11.98 | $5,990.00 |
| 07/23/10 | 1,305 | $11.97 | $15,620.85 |
| 07/23/10 | 1,289 | $11.96 | $15,416.44 |
| 07/23/10 | 1,641 | $11.95 | $19,609.95 |
| 07/23/10 | 7,710 | $11.94 | $92,057.40 |
| 07/26/10 | 300 | $12.60 | $3,780.00 |
| 07/26/10 | 500 | $12.59 | $6,295.00 |
| 07/26/10 | 1,400 | $12.58 | $17,612.00 |
| 07/26/10 | 1,200 | $12.57 | $15,084.00 |
| 07/26/10 | 3,900 | $12.56 | $48,984.00 |
| 07/26/10 | 5,100 | $12.55 | $64,005.00 |
| 07/26/10 | 7,600 | $12.54 | $95,304.00 |
| 01/10/11 | 100 | $12.94 | $1,294.00 |
| 01/11/11 | 258 | $13.03 | $3,361.74 |
| 01/11/11 | 100 | $13.01 | $1,301.00 |
| 01/11/11 | 300 | $12.99 | $3,897.00 |
| 01/11/11 | 100 | $12.98 | $1,298.00 |
| 01/11/11 | 100 | $12.97 | $1,297.00 |
| 01/11/11 | 3,360 | $12.96 | $43,545.60 |
| 01/11/11 | 4,550 | $12.95 | $58,922.50 |
| 01/11/11 | 2,100 | $12.94 | $27,174.00 |
| 01/11/11 | 800 | $12.94 | $10,352.00 |
| 01/12/11 | 300 | $13.06 | $3,918.00 |

| Date | # Shares | Price/Share | Proceeds |
|------|----------|-------------|----------|
| 01/12/11 | 882 | $13.02 | $11,483.64 |
| 01/12/11 | 518 | $13.00 | $6,734.00 |
| 01/12/11 | 6,532 | $12.97 | $84,720.04 |
| | | | |
| **Total** | **100,000 shares** | | **$1,296,290.46** |

143.    Defendant Yau-Sing Tang, CAGC's CFO, engaged in the following sales during the Class Period:

| Date | # Shares | Price/Share | Proceeds |
|------|----------|-------------|----------|
| 05/12/10 | 10,000 | $15.30 | $153,000.00 |
| 05/13/10 | 5,000 | $16.60 | $83,000.00 |
| 06/07/10 | 5,000 | $11.38 | $56,921.00 |
| 08/02/10 | 10,000 | $13.00 | $130,000.00 |
| 08/03/10 | 5,500 | $14.00 | $77,000.00 |
| 08/03/10 | 500 | $14.01 | $7,005.00 |
| 08/03/10 | 200 | $14.09 | $2,818.00 |
| 08/03/10 | 1,900 | $14.10 | $26,790.00 |
| 08/03/10 | 300 | $14.11 | $4,233.00 |
| 08/03/10 | 200 | $14.05 | $2,810.00 |
| 08/03/10 | 800 | $14.02 | $11,216.00 |
| 08/03/10 | 200 | $14.03 | $2,806.00 |
| 08/03/10 | 400 | $14.14 | $5,656.00 |
| 08/06/10 | 850 | $15.16 | $12,886.00 |
| 08/06/10 | 300 | $15.15 | $4,545.00 |
| 08/06/10 | 350 | $15.11 | $5,288.50 |
| 08/06/10 | 200 | $15.12 | $3,024.00 |
| 08/06/10 | 800 | $15.10 | $12,080.00 |
| 08/06/10 | 400 | $15.09 | $6,036.00 |
| 08/06/10 | 300 | $15.04 | $4,512.00 |
| 08/06/10 | 1,600 | $15.03 | $24,048.00 |
| 08/06/10 | 600 | $15.06 | $9,036.00 |
| 08/06/10 | 900 | $15.07 | $13,563.00 |
| 08/06/10 | 500 | $15.05 | $7,525.00 |

| | | | |
|---|---|---|---|
| 08/06/10 | 3,200 | $15.00 | $48,000.00 |
| 12/29/10 | 5,000 | $12.50 | $62,500.00 |
| 12/30/10 | 5,000 | $13.00 | $65,000.00 |
| 01/06/11 | 5,000 | $13.50 | $67,500.00 |
| | | | |
| **Total** | **65,000 shares** | | **$908,798.50** |

144.   Defendant Mingfang Zhu, CAGC's COO, engaged in the following sales during the Class Period:

| **Date** | **# Shares** | **Price/Share** | **Proceeds** |
|---|---|---|---|
| 5/18/2010 | 1,830 | $15.60 | $28,548.00 |
| 5/18/2010 | 70 | $15.61 | $1,092.35 |
| 5/19/2010 | 847 | $12.68 | $10,739.96 |
| 5/19/2010 | 100 | $12.65 | $1,265.00 |
| 5/19/2010 | 347 | $12.62 | $4,379.14 |
| 5/19/2010 | 300 | $12.64 | $3,792.00 |
| 5/19/2010 | 353 | $12.63 | $4,458.39 |
| 5/19/2010 | 200 | $12.60 | $2,520.00 |
| 5/19/2010 | 500 | $12.61 | $6,305.00 |
| 5/19/2010 | 700 | $12.72 | $8,904.00 |
| 5/19/2010 | 853 | $12.70 | $10,833.10 |
| 5/19/2010 | 700 | $12.71 | $8,897.00 |
| 5/19/2010 | 500 | $12.74 | $6,370.00 |
| 5/19/2010 | 200 | $12.79 | $2,558.00 |
| 5/19/2010 | 700 | $12.83 | $8,981.00 |
| 5/19/2010 | 700 | $12.78 | $8,946.00 |
| 5/19/2010 | 500 | $12.77 | $6,385.00 |
| 5/19/2010 | 600 | $12.76 | $7,656.00 |
| 5/19/2010 | 400 | $12.69 | $5,076.00 |
| 5/19/2010 | 700 | $12.66 | $8,862.00 |
| 5/19/2010 | 700 | $12.67 | $8,869.00 |
| 5/19/2010 | 300 | $12.82 | $3,846.00 |
| 5/19/2010 | 250 | $12.81 | $3,202.50 |
| 5/19/2010 | 1,150 | $12.84 | $14,766.00 |
| 5/19/2010 | 1,550 | $12.85 | $19,917.50 |
| 5/19/2010 | 370 | $12.86 | $4,758.20 |
| 5/19/2010 | 500 | $12.90 | $6,450.00 |

| **Date** | **# Shares** | **Price/Share** | **Proceeds** |
|---|---|---|---|
| 5/19/2010 | 300 | $12.95 | $3,885.00 |
| 5/19/2010 | 500 | $12.94 | $6,470.00 |
| 5/19/2010 | 400 | $12.91 | $5,164.00 |
| 5/19/2010 | 300 | $12.88 | $3,864.00 |
| 5/19/2010 | 500 | $12.93 | $6,465.00 |
| 5/19/2010 | 400 | $12.96 | $5,184.00 |
| 5/19/2010 | 200 | $12.92 | $2,584.00 |
| 5/19/2010 | 680 | $12.89 | $8,765.20 |
| 5/19/2010 | 800 | $12.80 | $10,240.00 |
| 5/19/2010 | 500 | $13.24 | $6,620.00 |
| 5/19/2010 | 200 | $13.26 | $2,652.00 |
| 5/19/2010 | 300 | $13.25 | $3,975.00 |
| 5/19/2010 | 800 | $13.22 | $10,576.00 |
| 5/19/2010 | 500 | $13.29 | $6,645.00 |
| 5/19/2010 | 1,600 | $13.19 | $21,104.00 |
| 5/19/2010 | 1,900 | $13.18 | $25,042.00 |
| 5/19/2010 | 1,250 | $13.13 | $16,412.50 |
| 5/19/2010 | 450 | $13.06 | $5,877.00 |
| 5/19/2010 | 200 | $13.09 | $2,618.00 |
| 5/19/2010 | 700 | $13.10 | $9,170.00 |
| 5/19/2010 | 500 | $13.07 | $6,535.00 |
| 5/19/2010 | 300 | $13.08 | $3,924.00 |
| 5/19/2010 | 300 | $13.15 | $3,945.00 |
| 5/19/2010 | 200 | $13.16 | $2,632.00 |
| 5/19/2010 | 100 | $13.11 | $1,311.00 |
| 5/19/2010 | 100 | $13.17 | $1,317.00 |
| 5/19/2010 | 100 | $13.20 | $1,320.00 |
| 5/27/2010 | 13,182 | $13.00 | $171,366.00 |
| 5/27/2010 | 1,718 | $13.01 | $22,351.18 |
| 5/27/2010 | 1,251 | $13.03 | $16,300.53 |
| 5/27/2010 | 2,049 | $13.04 | $26,718.96 |
| 5/27/2010 | 900 | $13.02 | $11,718.00 |
| 5/27/2010 | 100 | $13.08 | $1,308.00 |
| 5/27/2010 | 300 | $13.05 | $3,915.00 |
| 5/27/2010 | 100 | $13.06 | $1,305.50 |
| 5/27/2010 | 100 | $13.07 | $1,307.00 |
| 5/27/2010 | 300 | $13.06 | $3,918.00 |

| Date | # Shares | Price/Share | Proceeds |
|------|----------|-------------|----------|
| 6/4/2010 | 13,486 | $12.00 | $161,832.00 |
| 6/4/2010 | 1,200 | $12.01 | $14,412.00 |
| 6/4/2010 | 1,214 | $12.02 | $14,592.28 |
| 6/4/2010 | 300 | $12.04 | $3,612.00 |
| 6/4/2010 | 100 | $12.05 | $1,205.00 |
| 6/4/2010 | 1,800 | $12.03 | $21,654.00 |
| 6/4/2010 | 100 | $12.02 | $1,201.50 |
| 6/4/2010 | 100 | $12.11 | $1,211.00 |
| 6/4/2010 | 1,700 | $12.10 | $20,570.00 |
| | | | |
| **Total** | **70,000 shares** | | **$893,171.79** |

### B. CAGC's Misconduct Was So Serious that NASDAQ Delisted the Company's Securities from Trading And the SEC Revokes CAGC's Registration

145. CAGC's misconduct was evidently serious enough that on April 12, 2011, it received a letter from NASDAQ stating that:[34]

- "the staff of Nasdaq believes that the continued listing of the Company's securities on Nasdaq is no longer warranted based on public interest concerns and the Company's failure to file its 2010 Form 10-K on time (the 'Nasdaq Letter')."

- "the staff of Nasdaq believes **that the serious concerns raised by our former auditors, Ernst & Young Hua Ming ("E&Y"), relating to issues surfacing in the audit process rise to the level of a public interest concern** . . . ."

146. On October 17, 2012 the SEC issued an order revoking the registration of CAGC's common stock "for the protection of investors."[35]

---

[34] CACG disclosed the letter in its 8-K filed with the SEC on April 18, 2011. *See* China Agritech, Inc., Current Report (Form 8-K) (Apr. 18, 2011) (emphasis added).

C.      **The Revolving Door for CAGC's Auditors**

147.    CAGC has changed auditors four times in three years.  Since 2008, the Company has had four independent auditors.

148.    Kabani & Company, Inc., ("Kabani") a Los Angeles-based accountancy firm, audited the Company's 2007 financials.  Kabani was the accountancy that audited the notoriously fraudulent Bodisen Biotech, an organic fertilizer company that was delisted in 2007,[36] and China Green Agriculture (CGA), a firm which was also disclosed having falsely reported its results to U.S. investors.[37]

149.    Effective April 18, 2008, CAGC terminated Kabani and retained Grobstein, Horwath & Company LLP (later renamed Crowe Horwath LLP) as its auditor.[38]  CAGC then terminated Crowe Horwath and retained E&Y in November, 2010.[39]  Although CAGC did not disclose any reason for concern regarding its dismissal of Crowe Horwath,  E&Y's March 15, 2011 letter set forth in part above demonstrates that Crowe Horwath had identified "a significant control deficiency" which E&Y later concluded "potentially represents a material accounting error that may require restatement of the Company's Forms 10-Q during 2010."

150.    However, CAGC fired E&Y four months later on March 14, 2011 after E&Y identified issues in the 2009 audit, and stated it could no longer rely on

---

[35]    *See* China Agritech, Inc., Exchange Act Release No. 68060, 2012 SEC LEXIS 3277, 2012 WL 4909381 (Comm'n Sec. Oct. 17, 2012).

[36]    *See* Bodisen Biotech, Inc., Notification Removal from Listing or Reg. Under Section 12(b) of the Exchange Act (Form 25-NSE & Attachment) (Apr. 24, 2007).

[37]    *See* China Green Agriculture, http://www.cgagri.com/investor/investor5-1.htm (last visited June 23, 2014).

[38]    *See* China Agritech, Inc., Current Report, Item 4.01, Ex. 99.1 (Form 8-K) (Apr. 24, 2008).

[39]    *See* China Agritech, Inc., Current Report, Item 4.01, Ex. 99.1 (Form 8-K) (Nov. 17, 2010).

representations of CAGC management.[40]   Yet the Audit Committee's resolution to dismiss E&Y purportedly based on new "independence concerns" related to E&Y acting as a consultant to the Company for SOX404 compliance from 2008 to 2010 was belied by E&Y's March 15, 2011 letter stating that such issues  were fully considered at the time of E&Y's engagement in November 2010 and that the Audit Committee confirmed these issues did not impair E&Y's ability to serve as CAGC's independent auditors.

151.   On April 12, 2011, CAGC announced it had hired Simon & Edward LLP as its new independent auditor to replace E&Y.[41]   Still, CAGC has not produced audited financial statements for fiscal year 2010.

### D.   The SEC has Warned of Reverse Merger Companies Such as CAGC

152.   Chinese reverse mergers ("CRMs") have been a magnet for disreputable stock promoters, leading the SEC to issue warnings about investing in companies like CAGC.

153.   Shielded by the geographic distance of thousands of miles and operating under a regulatory CRM reverse merger companies have few incentives to provide complete and accurate disclosures to American investors. An August 28, 2010 article in *Barron's* by Bill Alpert and Leslie P. Norton entitled, "Beware This Chinese Export," discusses the enforcement problems that American regulators face when dealing with Chinese companies that trade on U.S. exchanges through CRMs. The article states that "[t]he SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S."

---

[40]     *See* China Agritech, Inc., Current Report, Items 4.01, 5.02, 8.01, Exs. 16.1, 99.1 (Form 8-K) (Mar. 18, 2011).

[41]     *See* China Agritech, Inc., Current Report, Item 4.01, Ex. 99.1 (Form 8-K) (Apr. 12, 2011).

154.   U.S. regulators have finally begun to take notice of the manipulation and fraud endemic in CRMs. The SEC has established a task force to investigate investors' claims regarding the impropriety and fraud of CRMs trading on the U.S. markets.   SEC Commissioner Luis A. Aguilar (the "Commissioner") discussed Chinese reverse mergers and the process of "backdoor registration," stating:[42]

> In the world of backdoor registrations to gain entry into the U.S. public market, the use by Chinese companies has raised some unique issues, even compared to mergers by U.S. companies. Two important ones are:
>
> - First, there appear to be **systematic concerns with the quality of the auditing and financial reporting**; and
> - Second, even though these companies are registered here in the U.S., there **are limitations on the ability to enforce the securities laws, and for investors to recover their losses when disclosures are found to be untrue, or even fraudulent**.
>
> **I am worried by the systematic concerns surrounding the quality of the financial reporting by these companies**. In particular, according to a recent report by the staff of the Public Company Accounting Oversight Board (PCAOB), U.S. auditing firms may be issuing audit opinions on the financials, but not engaging in any of their own work. Instead, the U.S. firm may be issuing an opinion based almost entirely on work performed by Chinese audit firms. If this is true, it could appear that the U.S. audit firms are simply selling their name and PCAOB-registered status because they are not engaging in independent activity to confirm that the work they are relying on is of high quality. This is significant for a lot of reasons, including that the PCAOB has been prevented from inspecting audit firms in China.

---

[42]   Luis A. Aguilar, SEC Comm'r, Facilitation Real Capital Formation, Address Before the Council of Institutional Investors Spring Meeting (Apr. 4, 2011) *in* Wash. D.C. *available at* http://www.sec.gov/news/speech/2011/spch040411laa.htm.

1   *Id.* (emphasis added).

2       146.   On June 9, 2011, the SEC issued an Investor Bulletin on Risks of

3   Investing in Reverse Merger Companies, warning investors about investing in

4   companies that enter U.S. markets through CRM because "…there have been

5   instances of fraud and other abuses involving reverse merger companies."  The

6   Bulletin specified that "[g]iven the potential risks, investors should be especially

7   careful when considering investing in the stock of reverse merger companies," said

8   Lori J. Schock, Director of the SEC's Office of Investor Education and Advocacy.[43]

9                    **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

10      147.   Plaintiffs bring this action as a class action pursuant to Federal Rules of

11  Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who

12  purchased the common stock of CAGC during the Class Period and who were

13  damaged thereby. Excluded from the Class are Defendants, the present and former

14  officers and directors of CAGC and any subsidiary thereof, members of any

15  defendants' immediate families and their legal representatives, heirs, successors or

16  assigns and any entity in which defendants have or had a controlling interest.

17      148.   The members of the Class are so numerous that joinder of all members

18  is impracticable. Throughout the Class Period, CAGC's stock was actively traded on

19  the NASDAQ at all times during the Class Period.

20      149.   While the exact number of Class members is unknown to Plaintiffs at

21  this time and can only be ascertained through appropriate discovery, Plaintiffs

22  believe that there are at least hundreds, if not thousands, of members in the proposed

23  Class, particularly given the size of CAGC's public float as set forth in CAGC's

24  public SEC filings, which for example was 13,051,808 on July 16, 2010.  Members

25  of the Class may be identified from records maintained by CAGC or its transfer

26  ──────────────────────

27  [43]    *See* Press Release, SEC, SEC Issues Bulletin on Risks of Investing in Reverse
     Merger Companies (June 9, 2011) *available at* http://www.sec.gov/news/press/2011/

28  2011-123.htm.

agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

150. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

151. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

152. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, and financial performance of CAGC; and

    c.  to what extent the members of the Class have sustained damages and the proper measure of damages.

153. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## RELIANCE IS PRESUMED UNDER FRAUD ON THE MARKET

154. Plaintiffs are permitted a presumption of reliance because CAGC stock was traded in an efficient market during the Class Period. At all relevant times, the

market for CAGC common stock was an efficient market for the following reasons, among others:

    a. CAGC stock met the requirements for listing, and was listed and actively traded on the on the NASDAQ market (under ticker symbol "CAGC"), a highly efficient and automated market;

    b. As stated in the SEC filing DEF 14A dated July 22, 2010, in the section captioned "Security Ownership of Certain Beneficial Owners and Management," on July 16, 2010, there were 20,766,243 shares of Common Stock outstanding.  Of these shares, a total of 7,724,435 are attributed to officers and directors.  The public float (shares not held by reported insiders) were 13,051,808 at that date;

    c. During the class period, the weekly average number shares traded (split-adjusted) was 4.4 million. Approximately 33.7% of the public float, and 21.2% of all outstanding shares, were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

    d. As a regulated issuer CAGC filed with the SEC periodic public reports and was eligible (and did file) S-3 registration statements with the SEC during the Class Period (February 9, 2010, May 12, 2010, April 16, 2010, and October 19, 2010);

    e. CAGC conducted a $23 million offering of shares during the Class Period, which attracted media coverage and investor interest;

    f. CAGC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting service;

g.   There were more than 2,100 news stories, and analyst reports, and other media coverage regarding CAGC during the Class Period;

h.   CAGC was followed by several securities analysts employed by major brokerage firms including Brean Murray, Rodman and Renshaw, LM Research, Bronte Capital, and Chardan Capital (among others), who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. There were at least 125 investment reports published by analysts and others during the Class Period, which disseminated information about CAGC to investors;

i.   On average 28 NASD member firms were active market-makers in CAGC stock at all times during the Class Period;

j.   Unexpected material news about CAGC was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

k.   There is a strong statistically significant cause and effect relationship between the release of new company specific information and changes in CAGC's stock price.  For example:

   •   On December 23, 2009, CAGC disclosed that it had achieved its 2009 sales target of 80,000 metric tons of organic granular fertilizer. This positive news caused an increase in CAGC's stock price of $2.12/share (adjusted for the two-for-one stock split effective February 10, 2010).  The CAGC stock-price increase was statistically significant at the 99% confidence level.

   •   On February 8, 2010, CAGC released FY10 revenue guidance of approximately $114M vs. consensus estimates of $69.46M. This positive news caused an increase of CAGC's stock price of

$1.20/share (adjusted for the two-for-one stock split effective February 10, 2010).  The CAGC stock-price increase was statistically significant at the 95% confidence level.

- On August 12, 2010, CAGC announced earnings per share for the second quarter 2010 that exceeded the analyst consensus estimate. This positive news caused an increase of CAGC's stock price of $2.97/share.  The CAGC stock-price increase was statistically significant at the 99% confidence level.

- On September 8, 2010, an analyst at Chardan Capital Markets downgraded shares of CAGC from Neutral to Sell.  This negative news caused a decrease of CAGC's stock price of $2.59/share. CAGC's stock-price decrease was statistically significant at the 99% confidence level.

- On November 10, 2010, CAGC announced earnings per share that missed the analyst consensus estimate.  This negative news caused CAGC's stock price to decrease $3.26/share. CAGC's stock-price decrease was statistically significant at the 99% confidence level.

## AFFILIATED UTE

155.  With respect to Defendants' failure to disclose material related party transactions, Plaintiffs are permitted a presumption of reliance under the U.S. Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted related party transactions important in deciding whether to purchase CAGC stock.

156.   Here, Plaintiffs need not prove that they relied on Defendants' material omission of the related party transactions in purchasing CAGC stock, because under

*Affiliated Ute*, the related party transactions are material facts, and therefore, Plaintiffs are entitled to a presumption of reliance.

<u>**COUNT I**</u>

**For Violations of Section 10(b) of The Exchange Act**

**and Rule 10b-5 Promulgated Thereunder**

**(On Behalf of Plaintiffs and the Proposed Class and Against All Defendants)**

157.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

158.   This first cause of action is asserted on behalf of Plaintiffs and the Proposed Class against all Defendants.

159.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell CAGC's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

160.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CAGC as specified herein.

161.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CAGC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material

facts and omitting to state material facts necessary in order to make the statements made about CAGC and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers CAGC securities during the Class Period.

162. Each of the Defendants' primary liability, and controlling person liability, arises from the following: (a) defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and (d) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

163. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CAGC's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in

failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

164.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for CAGC's securities was artificially inflated during the Class Period.

165.    In ignorance of the fact that market prices of CAGC's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired CAGC's securities during the Class Period at artificially high prices and were damaged thereby.

166.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding CAGC's financial results and condition, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired CAGC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

167.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

168.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

169.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

### COUNT II

**For Violation of Section 20(a) of The Exchange Act**

**(On Behalf of Plaintiffs and the Proposed Class and**

**Against the Individual Defendants)**

170.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

171.   This Second Claim is asserted against each of the Individual Defendants.

172.   The Individual Defendants, acted as controlling persons of CAGC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

173.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

174. As set forth above, CAGC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

175. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

176. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

a. Determining that this action is a proper class action and certifying Plaintiffs as a class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Proposed Class their reasonable attorneys' fees, costs and expenses incurred in this action; and

d. Such other and further relief as the Court may deem just and proper.

///
///

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:  October 4, 2017                    **WOLF HALDENSTEIN ADLER
                                             FREEMAN & HERZ LLP**

                                        By: /s/*Matthew M. Guiney*
                                                MATTHEW M. GUINEY

                                        MATTHEW M. GUINEY (*pro hac vice*)
                                        guiney@whafh.com
                                        **WOLF HALDENSTEIN ADLER
                                          FREEMAN & HERZ LLP**
                                        270 Madison Avenue
                                        New York, NY 10016
                                        Telephone:  212/545-4600
                                        Facsimile:  212/545-4653

                                        **WOLF HALDENSTEIN ADLER
                                          FREEMAN & HERZ LLP**
                                        BETSY C. MANIFOLD
                                        manifold@whafh.com
                                        RACHELE R. RICKERT
                                        rickert@whafh.com
                                        MARISA C. LIVESAY
                                        livesay@whafh.com
                                        750 B Street, Suite 2770
                                        San Diego, CA 92101
                                        Telephone:  619/239-4599
                                        Facsimile:  619/234-4599

                                        **BROWER PIVEN**
                                          A Professional Corporation
                                        DAVID A.P. BROWER
                                        brower@browerpiven.com
                                        DANIEL KUZNICKI
                                        kuznicki@browerpiven.com

- 62 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

475 Park Avenue South, 33rd Floor
New York, New York 10016
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

*Attorneys for Plaintiffs and the [Proposed]
Class*

CHINA.AGRITECH:24186